FAUSLER and Others *v.* JONES and Others.

Parol evidence to establish a resulting trust must be received with great cau-
tion.

Bill by *A.* and the heirs of *B.* against *C.'s* heirs, to enforce a resulting trust.
The bill was filed in *July*, 1841. The facts were as follows: *C.* being about
to proceed upon a journey to enter lands, his mother placed in his hands
100 dollars, directing him to purchase therewith a tract of land for her sons
*A.* and *B.* With this and money of his own, *C.* entered several tracts,
taking the titles in his own name. He died in 1835. *A.* was a minor until
near that time, and *B.* until sometime afterward in 1835. *A.* and *B.* had
frequently claimed of *C.*, in his lifetime, their share of the land, &c. It
was not shown that six years had elapsed after *A.* attained to his majority,
before the bill was filed, and it was shown that *B.* arrived at age within
that time.

*Held,* that the receipt of the money from the mother by *C.*, with the directions
given, and the subsequent purchase of the land by *C.* in his own name,
created a resulting trust in favor of *A.* and *B.*  ·

*Held,* also, that *A.*, having improperly taken all the titles in his own name,
neither he nor his heirs could object that the subject of the trust was uncer-
tain.

*Held,* also, that, as in the case of the confusion of goods, *C.'s* heirs must
suffer the inconveniences in ascertaining the land to which *A.* and *B.* were
entitled, growing out of the fraudulent conduct of *C.*

*Held,* also, that *A.* and *B.* were not barred of the relief sought by lapse of
time.

Money placed in the hands of one for the benefit of another, by a third per-
son, may be recovered in equity by the *cestui que trust.*

    APPEAL from the *Shelby* Circuit Court.        *Monday,*
                                             *December* 17.

    GOOKINS, J.—This was a bill in chancery by the appel-
lees against the appellants, to enforce a resulting trust.
The Circuit Court established the trust, and decreed a
conveyance, from which decree the defendants appeal.

The following facts are established by the proof. *William Fausler*, the alleged trustee, and his brother *Peter*, were the sons of *Barbara*, by her first husband, *Frederick Fausler*, from whom she received some estate at his death. She afterwards intermarried with one *Jones*, by whom she had issue *Isaac* and *Samuel*, the original plaintiffs. She appears to have been divorced from *Jones*, and afterwards intermarried with one *Surber*. About the year 1821, *William* and *Peter Fausler*, having each 200 dollars, were about setting out from *Ohio* to buy land in *Indiana*, and *Barbara*, the mother, delivered to *William* 100 dollars, derived from her former husband's estate, with directions to buy eighty acres of land for her two sons, *Isaac* and *Samuel*. They came to *Shelby* county, and purchased five eighty acre tracts at the land-office at *Indianapolis*, for which they paid 100 dollars each. *Peter Fausler* being a deaf mute, the business was transacted by *William*, who took the title to four tracts in his own name and to one in the name of *Peter*. *William* and his mother lived mostly together in *Ohio* and *Indiana*, until her death in 1826, he having until then remained unmarried. She was an industrious and healthy woman, and performed the usual labor of house-keeping, including weaving, making clothes, &c., for *William*, but she and *William* kept their property separate. The plaintiffs worked for *William*, assisted in clearing his land, &c., and sometimes worked abroad. They claimed of *William*, in his lifetime, their share of the land or of the money he had received for them, and sometimes quarreled with him about it. When the mother died, *William* paid her physician's bill and burial expenses, and also the expenses of a messenger whom she sent to *Ohio* for him during her last sickness; and *William* took a horse, gun, and some other articles of small value belonging to her, and appropriated them to his own use. When the mother sent the messenger to *Ohio*, she stated that she had let *William* have money, and that he would pay him for his trouble and expenses. *William Fausler* died in 1835, leaving the defendants his widow and heirs at law. *Isaac Jones* attained his majority about the time of *William*

*Fausler's* death, and *Samuel* after it. After the death of *William*, *Peter Fausler*, by a decree of Court, obtained from the heirs of *William* a title to one of said tracts, and said heirs remained seized of the remaining three tracts at the filing of the bill in 1841. During the pendency of the suit, *Samuel Jones* died, and as to his interest, it was revived in the name of his heirs.

The facts which have been stated are chiefly proved by parol, and most of them by the confessions and declarations of *William Fausler*. The delivery of the money by the mother to *William* was, however, directly proved by two witnesses, one of whom stated that it was to be laid out in land for the plaintiffs; and several confessions of *William* to the same purport were proved. One witness testified that *William Fausler* related to her particularly the circumstances attending the receipt of the money and the purchase of the land. Her statement is substantially this: He told the witness that when he and his mother lived in *Ohio*, he was going to the land-office at *Indianapolis* to buy land for himself and his brother *Peter;* that when he was setting out, his mother gave him 100 dollars, and told him to buy eighty acres of land for the two boys, *Samuel* and *Isaac Jones;* he further stated that when he went to the land-office, he bought five eighty acre lots, two for himself, two for his brother *Peter*, and one for *Isaac* and *Samuel Jones*, and that he entered all the land in his own name, except one lot which he entered in the name of his brother *Peter.* There was other testimony of similar declarations made by *William*, though related less circumstantially than the foregoing. In the statements proved to have been made by *William Fausler*, he did not designate which of the tracts he intended for the plaintiffs, but a witness inferred from what he said, that the tract of which *Peter Fausler* obtained the title after *William's* death, was the one he designed for them.

The decree states that the tract of land entered by *William Fausler* for the plaintiffs is not identified, and it gives them an undivided third part of the three tracts, reserving

Nov. Term,
1855.

FAUSLER
v.
JONES.

the rights of both parties in respect to rents and improvements.

The principal objections taken to the decree are, that the trust was too indefinite to be enforced; that the subject of it could not be and was not identified; that the trust was not sufficiently proved; that the money having been received from the mother, the trust, if created, resulted to her; that she revoked the gift in her lifetime; and that the claim had become stale by lapse of time.

We are not disposed to relax the rule laid down in *Blair* v. *Bass*, 4 Blackf. 539, that parol evidence to establish a resulting trust must be clear, and that it should be received with great caution. So far as the receipt of the money, upon the special trust and confidence stated in the bill, is concerned, the proof is clear beyond a doubt. Any uncertainty in respect to the subject matter of the trust, results entirely from the conduct of the trustee. He ought to have taken the title to one of the tracts in the name of the plaintiffs. Having taken the titles all in his own name, neither he nor his heirs can complain of the consequences. It is like the confusion of goods, in which the delinquent party must suffer all the inconvenience resulting from his own wrongful act.

We think the receipt of the money from the mother, with directions to invest it in land for the plaintiffs, and the subsequent purchase of land with the money in the name of the trustee, created a resulting trust in their favor. Mr. *Story* says, " The most simple form, perhaps, in which an implied trust can be presented, is that of money or other property delivered by one person to another, to be by the latter paid or delivered over to and for the benefit of a third person. In such a case," he says, "the party so receiving the money, or other property, holds it upon a trust; a trust necessarily implied from the nature of the transaction, in favor of such beneficiary, although no express agreement has been entered into to that effect." He proceeds to say, however, that "the trust is not, under all circumstances, absolute; for if the trust is purely voluntary, and without any consideration, and the beneficiary

has not become a party to it by his express assent after notice of it, it is revocable; and if revoked, then the original trust is gone, and an implied trust results in favor of the party who originally created it." Story's Eq. Jur., s. 1196, and authorities there cited.

*Farlow* v. *Kemp*, 7 Blackf. 544, is cited by the appellants, to sustain their position. The effect of that decision is, that the plaintiffs could not have maintained an action at law for the money against *William Fausler;* and so this Court has frequently decided. But in equity a different doctrine prevails. See Story's Eq. Jur., s. 1041, and note, where the authorities are collated, and the distinction between proceedings at law and in equity stated.

There was no evidence that the trust was ever revoked by the mother. All that appeared tending that way was a statement by the mother when the messenger was sent at her request for *William*, in her last sickness, that she had let him have money, and that he would pay him for his trouble and expenses. Whether it was the trust money to which she referred, or some other, does not appear. A trust having been established by competent evidence, it devolved on the defendants to show that it had been revoked.

We do not think the lapse of time, under the circumstances, sufficient to authorize a Court of equity to refuse the relief sought. The elder *Jones* was a minor until about the time of *William Fausler's* death, and the younger until after it. He died in 1835, (at what time does not appear,) leaving infant heirs, and the bill was filed in *July*, 1841. It is not shown that six years elapsed after the elder *Jones* attained his majority, before the filing of the bill, and it is satisfactorily shown that *Samuel* arrived at age within that period.

Upon the whole case we think the decree ought to be affirmed.

*Per Curiam.*—The decree is affirmed with costs.

*S. Major* and *C. Wright*, for the appellants.

*M. M. Ray*, for the appellees.